STATE OF CONNECTICUT *v.* CRAIG WILSON
(AC 28554)

DiPentima, Lavine and Dupont, Js.

Argued September 15—officially released December 16, 2008

*Norman A. Pattis*, with whom, on the brief, was *Kim Coleman*, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Brian F. Kennedy*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, Craig Wilson, appeals from the judgment of conviction, rendered after a jury trial, of six crimes, namely, sale of narcotics by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), sale of narcotics within 1500 feet of a school in violation of General Statutes § 21a-278a (b), possession of narcotics with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b), possession of narcotics in violation of General Statutes § 21a-279 (a) and possession of marijuana in violation of § 21a-279 (c).[1] On appeal, the defendant has raised three claims: (1) the trial court improperly denied his motion to suppress the evidence seized during a search of his vehicle; (2) certain comments made by the prosecutor in closing argument constituted prosecutorial impropriety;[2] and (3) the court's jury instructions regarding reasonable doubt were constitutionally infirm. We disagree. Accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the night of February 24, 2004, six members[3]

---

[1] The court sentenced the defendant to a total effective term of thirty years imprisonment, execution suspended after twenty-six years, and five years probation.

[2] In *State* v. *Fauci*, 282 Conn. 23, 26 n.2, 917 A.2d 978 (2007), our Supreme Court concluded that the term "prosecutorial impropriety" is more appropriate than the traditional term "prosecutorial misconduct." Although the parties briefed and argued the defendant's claim utilizing the nomenclature of "prosecutorial misconduct," we have used the term "prosecutorial impropriety" in our analysis of the defendant's claim.

[3] The six members of the team were Clive Higgins, Sean Ronan, William Reilly, John Andrews, Keith Ruffin and Chris Lamaine.

of the Bridgeport police department's tactical narcotics team were conducting an undercover operation at the corner of Connecticut and Union Avenues, an area known for drug trafficking. At approximately 11:30 p.m., Officer Clive Higgins, who was undercover, approached a male standing in front of a restaurant located on that corner and asked him if he had any "slabs."[4] The male told him to wait a few minutes because his "man" would be arriving with some. Higgins joined a group of people who were also waiting for this man in front of the restaurant.

A few seconds later, a dark colored four door sedan was driven onto Union Avenue and parked near an unmarked police car occupied by Officer Sean Ronan. The defendant got out of the sedan and walked toward the restaurant. The male standing in front of the restaurant pointed toward the defendant and announced: "That's the dude right there." The defendant then walked into the restaurant, and the "customers" waiting outside, including Higgins, followed him.

Inside the restaurant, Higgins observed the defendant making hand-to-hand drug transactions with the other "customers." When it was his turn, Higgins gave the defendant a $20 bill he had previously marked and photocopied; in return, the defendant gave Higgins some crack cocaine. Higgins then left the restaurant and returned to his unmarked police car. He gave a description of the defendant to other officers through the use of a listening device.

Meanwhile, Ronan watched the defendant leave the restaurant and walk back toward the vehicle in which he had arrived. Before reaching the vehicle, however, the defendant turned and started to walk back down Union Avenue in the opposite direction. Ronan believed

---

[4] "Slabs" is a street name for crack cocaine.

that the defendant had recognized him as a police officer. Ronan then radioed police officers William Reilly and John Andrews and directed them to move in and arrest the male standing on the west side of the road on Union Avenue, north of Connecticut Avenue.

Reilly and Andrews drove their cruiser onto Union Avenue and drove next to Ronan. As they approached, the defendant ran toward an alley to the left of the house located at 651 Union Avenue. Andrews and Reilly gave chase down the alley. The defendant threw two cellular telephones to the ground and jumped over a fence into the yard of an auto body shop. Andrews radioed the location of the defendant to police officers Chris Lamaine and Keith Ruffin and followed the defendant over the fence. Reilly stopped to pick up the two telephones. Inside one of the telephones, Reilly found eight small bags of a substance he suspected to be crack cocaine.

By the time Andrews got over the fence, Lamaine had apprehended the defendant. Ruffin searched the defendant and found a plant like substance he suspected to be marijuana and $120, which included the $20 bill Higgins had given the defendant in exchange for the crack cocaine. Andrews, Lamaine and Ruffin lifted the defendant, who was now handcuffed, back over the fence, with Reilly assisting from the other side. The defendant was placed in a patrol car and driven back to his vehicle on Union Avenue.

Reilly also patted down the defendant.[5] He found the key to the defendant's vehicle in the defendant's right front pocket. Reilly used the key to unlock the defendant's vehicle to perform a search. Inside the vehicle, he found forty-five bags of suspected crack cocaine in the center console and $984 and another cellular

---

[5] At trial, Reilly could not remember whether he patted down the defendant at the auto body shop or at the defendant's sedan.

telephone in the backseat. After the search, Reilly drove the vehicle to the narcotics unit on River Street. The car eventually was towed from that unit.

Rafal Mielgj, an analytical chemist with the department of public safety, tested the bag of suspected crack cocaine the defendant sold to Higgins, the eight bags of suspected crack cocaine found in the cellular telephone and the forty-five bags of suspected crack cocaine found in the defendant's vehicle. Each item was found to be freebase cocaine, or crack. Mielgj also tested the plant material located on the defendant's person and found it to be marijuana.

During the evidentiary portion of the defendant's trial, the court held a hearing outside the presence of the jury on the defendant's motion to suppress the narcotics, money and cellular telephone that were seized from the defendant's vehicle. At the hearing, the court heard testimony from Reilly. On the basis of that testimony and Ronan's testimony before the jury, the court denied the motion to suppress on the ground that an exception to the warrant requirement for a search and seizure applied. The court, however, did not specify which exception applied, and neither party requested an articulation.

I

The defendant first claims that the court improperly denied his motion to suppress the evidence seized from his automobile because the warrantless search of the vehicle did not fall within any of the exceptions to the warrant requirement, and, as such, his rights under the fourth and fourteenth amendments to the United States constitution and article first, § 7, of the constitution of Connecticut were violated.[6]

---

[6] The defendant, in his brief, notes that although in certain cases, article first, § 7, of the constitution of Connecticut affords greater protection than the fourth and fourteenth amendments to the United States constitution, the relevant analysis in the present case is the same under either our state or federal constitution.

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . . Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Foreman*, 288 Conn. 684, 691–92, 954 A.2d 135 (2008); *State* v. *Williams*, 110 Conn. App. 329, 332–33, 954 A.2d 878 (2008).

In the present matter, the defendant asserts that he is challenging the court's legal conclusion that the motion to suppress should be denied, not the court's factual findings. Accordingly, it is this court's duty to determine whether the denial of the motion to suppress was legally and logically correct "in light of the [trial court's] findings of fact." (Internal quotation marks omitted.) *State* v. *Kaminski*, 106 Conn. App. 114, 125, 940 A.2d 844, cert. denied, 287 Conn. 909, 950 A.2d 1286 (2008). The court, however, did not set forth the facts it found in support of its ruling. The parties indicate that this is of no importance because they agree that the facts are not in dispute. They fail, however, to cite any authority in support of this proposition.

Consequently, before reaching the question of the constitutionality of the search and seizure, we must first determine whether we may review that ultimate legal question without the benefit of any findings of fact by the court when the parties agree that the facts are not in dispute. Simply stated, the question is whether there are limited instances in which fact-finding by the trial court is not necessary to obtain appellate review of a constitutional issue. To find the answer, we have reviewed decisional and treatise authority.

"[A] judge must disclose the factual bases of his [or her] decision in [ruling on a motion to suppress]." C. Tait & E. Prescott, Connecticut Appellate Practice and Procedure (3d Ed. 2000) § 8.10, p. 308; see also Practice Book § 64-1. "Where a transcript of an oral decision of the trial court fails to set forth the factual basis of the trial court's decision, the [burden is on the defendant to] perfect the record on appeal either by filing a motion to compel the trial court to file a memorandum of decision . . . or by filing a motion for articulation . . . ." *State* v. *Fontanez*, 37 Conn. App. 205, 207, 655 A.2d 797 (1995). "Without any specific findings of fact . . . we cannot determine the basis of the court's ruling and thus cannot review the merits of [a] defendant's claim." (Internal quotation marks omitted.) Id. "[T]his court will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." (Internal quotation marks omitted.) *State* v. *Beliveau*, 52 Conn. App. 475, 482 n.4, 727 A.2d 737, cert. denied, 249 Conn. 920, 733 A.2d 235 (1999); see also C. Tait & E. Prescott, supra, § 8.8, p. 305 ("the Connecticut appellate courts are without authority to find facts or remake factual findings of a judge").

Nevertheless, even though the function of an appellate court is to review findings of fact, not make factual findings, an appellate court can draw "[c]onclusions of

fact . . . where the undisputed facts or uncontroverted evidence and testimony in the record make the factual conclusion so obvious as to be inherent in the trial court's decision." (Internal quotation marks omitted.) *State* v. *Mullins*, 288 Conn. 345, 359, 952 A.2d 784 (2008); *State* v. *Reagan*, 209 Conn. 1, 8–9, 546 A.2d 839 (1988). In the present case, the court explicitly stated that it was relying on the testimony of Ronan and Reilly. This court has the complete transcripts of their testimony, and the parties have agreed that the facts elicited from that testimony are not in dispute. As such, the factual conclusion of the court is so obvious that it is inherent in its decision. We conclude, therefore, that we can review the defendant's claim.

We next engage in a plenary review of the court's denial of the defendant's motion to suppress. The fourth amendment to the United States constitution protects the right of people to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const., amend. IV; see also Conn. Const., art. I, § 7. "Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause." (Internal quotation marks omitted.) *State* v. *Johnson*, 286 Conn. 427, 434, 944 A.2d 297, cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d. 144 (2008). "Under both the federal and the state constitutions, a warrantless search and seizure is per se unreasonable, subject to a few well defined exceptions." (Internal quotation marks omitted.) Id., 444. "These exceptions have been jealously and carefully drawn . . . and the burden is on the state to establish the exception." (Internal quotation marks omitted.) Id., 434.

"[The] . . . four recognized situations where a warrantless search of a car may lead to the conclusion that such a search was reasonable under the United States or [Connecticut constitution] . . . are: (1) it was made

incident to a lawful arrest; (2) it was conducted when there was probable cause to believe that the car contained contraband or evidence pertaining to a crime; (3) it was based upon consent; or (4) it was conducted pursuant to an inventory of the car's contents incident to impounding the car." (Internal quotation marks omitted.) *State* v. *Garcia*, 108 Conn. App. 533, 544–45, 949 A.2d 499, cert. denied, 289 Conn. 916, 957 A.2d 880 (2008). If none of these exceptions applies to a warrantless search of a vehicle, "[u]nder the exclusionary rule, [the] evidence must be suppressed [as] it is . . . the fruit of prior police illegality." (Internal quotation marks omitted.) Id., 543.

The state, in this appeal, argues that the warrantless search of the defendant's vehicle and the seizure of the money, drugs and cellular telephone found within the vehicle was legal pursuant to the following three exceptions to the warrant requirement: (1) there was probable cause to believe that the vehicle contained contraband, (2) the search was incident to a lawful arrest, and (3) the search was conducted to inventory personal property lawfully taken into police custody.

The first theory put forward by the state to justify the warrantless search of the defendant's vehicle is often referred to as the "automobile exception." See *State* v. *Smith*, 257 Conn. 216, 228, 777 A.2d 182 (2001), on appeal after remand, 94 Conn. App. 188, 891 A.2d 974, cert. denied, 278 Conn. 906, 897 A.2d 100 (2006). "The justification for . . . [the] automobile exception is twofold: (1) the inherent mobility of an automobile creates exigent circumstances; and (2) the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." (Internal quotation marks omitted.) Id., 228–29. "This exception to the warrant requirement demands that the officers have probable cause to believe that the vehicle

contains contraband. . . . The probable cause determination must be based on objective facts that could have justified the issuance of a warrant by a neutral magistrate at the time the search was made. . . . The absence of probable cause, despite the exigency created by the ready mobility of automobiles and the lesser expectation of privacy in them, will render any warrantless search unreasonable. . . . Probable cause to search exists if (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched." (Citations omitted; internal quotation marks omitted.) *State* v. *Badgett*, 200 Conn. 412, 429, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986).

As previously stated, in denying the defendant's motion to suppress on the basis of an exception to the warrant requirement, the court relied on the testimony of Ronan and Reilly. Their testimony revealed that the following factual information was available to the officers at the time they conducted the search of the defendant's vehicle: (1) an individual standing outside of the restaurant told an undercover police officer that a man would be arriving with crack cocaine for sale; (2) the defendant arrived on the scene moments later in the vehicle in question; (3) the defendant walked into the restaurant and sold suspected crack cocaine to several persons, including the undercover officer; (4) the defendant left the restaurant and immediately walked back toward the vehicle in question, yet turned around when he saw a police officer; (5) the defendant fled the scene, discarding two cellular telephones in the process, one of which contained eight packets of what officers suspected to be crack cocaine; (6) the defendant was apprehended and during the search of his person, the

key to the vehicle in question was found in the front pocket of his shirt; and (7) the key was used to access the defendant's vehicle.

The state claims that those facts established probable cause to search the defendant's vehicle for narcotics. We agree. "[A] police officer is certainly entitled to utilize his training and experience in ascertaining probable cause"; id., 430; and in this case, we conclude that the totality of these facts are sufficient to " 'warrant a man of reasonable caution in the belief' "; *State* v. *Olah*, 60 Conn. App. 350, 358, 759 A.2d 548 (2000); that more narcotics would be found in the vehicle. The defendant drove his vehicle to the scene to sell narcotics. Evidently, there were narcotics in the vehicle when he arrived because he had narcotics on him when he went inside the restaurant. The defendant immediately returned to his vehicle after leaving the restaurant. The fact that the defendant was able to provide narcotics for all of the "customers" inside the restaurant indicated that he was in possession of a substantial quantity of narcotics that were not for his personal use. The narcotics found in the cellular telephone showed that he had even more narcotics to sell had there been more "customers" at the restaurant. From all of this, it was reasonable for the officers to infer that there was a fair probability the defendant was storing even more narcotics in his vehicle for future sales.

The court does not find persuasive the defendant's argument that "there is no probable cause in the case at hand" because the defendant did not sell drugs directly from his vehicle. Although this is a common factual scenario in cases involving search and seizures that are based on the automobile exception to the warrant requirement; see *State* v. *Mounds*, 81 Conn. App. 361, 363, 840 A.2d 29, cert. denied, 268 Conn. 914, 845 A.2d 416 (2004); *State* v. *Glenn*, 30 Conn. App. 783, 787, 622

A.2d 1024 (1993); this court does not deem it to be a necessary prerequisite to a determination that probable cause existed in this case. In *State* v. *Patterson*, 31 Conn. App. 278, 309, 624 A.2d 1146 (1993), rev'd on other grounds, 230 Conn. 385, 645 A.2d 535 (1994), for example, this court held that the factual information available to officers at the time they conducted the search of the defendant's vehicle was adequate to establish probable cause when, as in the present case, the defendant was outside of his vehicle when he made the drug transaction.

Consequently, we conclude that the warrantless search of the defendant's vehicle and the seizure of the items found within was constitutionally valid pursuant to the "automobile exception," and, thus, the court properly denied the defendant's motion to suppress. Accordingly, we need not consider the applicability of the search incident to arrest or inventory exceptions to the warrant requirement.

II

The defendant next claims that the state engaged in prosecutorial impropriety during its closing argument and, therefore, deprived him of his due process right to a fair trial. Specifically, he maintains that the prosecutor improperly alluded to the defendant's decision not to testify, thereby violating his fifth amendment privilege against self-incrimination.

The following additional facts are relevant to the defendant's claim. During closing argument to the jury, the prosecutor stated: "Now, I'm going to talk about . . . how you determine whether or not there was the intent to sell. The court has an instruction as far as circumstantial evidence versus direct evidence. I want you to listen to that instruction. I anticipate that the instruction will indicate that circumstantial evidence is just as good, if you find it believable and proved, as

direct evidence. *And oftentimes, since a person won't come in and say, 'Hey, those drugs there, I intend to sell those,'* you actually have to infer intent through circumstantial evidence. And that's what the state is asking you to do in this case."[7] (Emphasis added.)

At the conclusion of the prosecutor's closing argument, defense counsel stated outside the jury's presence: "When [the prosecutor] was talking in reference to . . . intent to sell, he indicated a person won't come in and testify as to intent or something similar to that. I believe that that's objectionable and puts in the minds of the jurors the fact that [the defendant] . . . did not testify. So, I would ask that—and it's a curative instruction—for that comment [to] be read, that something to the effect of, in determining the intent, the statement concerning a person won't come in and testify should not be construed as—whatever Your Honor wants to frame it as, but some way to indicate to the jurors that the inference could be that because [the defendant] didn't testify it's because he's guilty, and would just explain his intent."

After rehearing the prosecutor's comment, however, defense counsel withdrew his request for a curative instruction, stating: "Well, in reviewing it and thinking about it, I don't know whether, even if Your Honor . . . agrees with me to read something, I don't know what that something should be and if that some—I mean, we could have some options, but that something may highlight it even more. So, upon reflection, I think that it's—I think that it does . . . sort of tread on the issue of whether [the defendant] testified or not. However, I think that Your Honor's instructions in the full instructions should cure that, and we don't need to do an additional, separate thing."

---

[7] It is the italicized portion of the prosecutor's remarks that the defendant claims violated his privilege against self-incrimination.

The court informed defense counsel that it would give the jurors the standard instructions that "arguments and statements by the attorneys are not evidence" and that they should "not draw any . . . inference" regarding the defendant's decision not to testify. The defendant agreed that these instructions would "be fine." Accordingly, in its final instructions, the court stated: "Certain things are not evidence, and you may not consider them in deciding what the facts are. These include, number one, arguments and statements by attorneys. The attorneys are not witnesses. What they have said in their closing arguments is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the attorneys have stated them, it is your memory of the facts that controls." The court also instructed: "[T]he defendant has not testified in this case. An accused person has the option to testify or not to testify at the trial. He is under no obligation to testify. He has a constitutional right not to testify. You must draw no unfavorable inferences from the defendant not testifying." The defendant's counsel did not take exception to either instruction.

The state, in its brief, argues that the prosecutor's remark was not improper because it did not encroach on the defendant's constitutional right to remain silent, and, even if it had, the defendant waived his claim that the remark deprived him of a fair trial when he withdrew his request for a curative instruction and agreed that the court's standard instructions would be sufficient to cure any possible prejudice. At oral argument in this court, the defendant maintained that the comment improperly drew the jury's attention to the fact that he did not testify and argued that we should review his claim that the remark deprived him of a fair trial because it was not affirmatively waived, only "tactically" waived and, therefore, not waived at all.

"In analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . Only if we conclude that prosecutorial [impropriety] has occurred do we then determine whether the defendant was deprived of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Thomas*, 110 Conn. App. 708, 723, 955 A.2d 1222, cert. denied, 289 Conn. 952, 961 A.2d 418 (2008).

We are also guided by additional legal principles regarding claims of prosecutorial impropriety during closing argument. "[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no

conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Rowe*, 279 Conn. 139, 158–59, 900 A.2d 1276 (2006).

With these principles in mind, we now turn to the first step of the analysis, which requires us to determine whether the challenged comment in the present case did, in fact, constitute an impropriety. "[T]he [f]ifth [a]mendment, in its direct application to the [f]ederal [g]overnment, and in its bearing on the [s]tates by reason of the [f]ourteenth [a]mendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt. *Griffin* v. *California*, [380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965)] . . . ." (Internal quotation marks omitted.) *State* v. *Rowe*, supra, 279 Conn. 159. "Our legislature has given statutory recognition to this right by virtue of its enactment of . . . [General Statutes] § 54-84." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 269, 833 A.2d 363 (2003). In determining whether a prosecutor's comment has encroached on a defendant's right to remain silent, we ask: "Was the language used manifestly intended to be, or was it of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" (Internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 539, 944 A.2d 947, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008). "To determine the natural and necessary impact

on the jury, the court looks to the context in which the statement was made." *State* v. *Hicks*, 56 Conn. App. 384, 393, 743 A.2d 640 (2000).

We are not persuaded that the comment challenged here was improper. The remark was made during the prosecutor's description of an element of the crime of intent to sell by a person who is not drug-dependent. In discussing that element of that crime, namely, intent, the prosecutor attempted to explain to the jurors that they can infer intent through circumstantial evidence. It would have been clear to the jury that the prosecutor used the remark, "since a person won't come in and say, 'Hey, those drugs there, I intend to sell those,'" to provide them with an example of direct evidence to better help them understand the difference between it and circumstantial evidence. Moreover, it is notable that the prosecutor did not say: "Since the *defendant* won't come in and say." Therefore, although it was a questionable choice of an example by the prosecutor, the jury would not naturally and necessarily interpret this remark as a comment on the defendant's failure to testify. Accordingly, the prosecutor did not impinge on the defendant's right against self-incrimination.

Because we conclude that the remark was not improper, we need not proceed to the second step of the analysis used in reviewing a claim of prosecutorial impropriety, i.e., the determination of whether the remark amounted to a denial of due process.[8] See *State*

---

[8] Consequently, we do not need to decide whether the state is correct in its assertion that we cannot review the defendant's claim that he was deprived of his due process right to a fair trial on the ground that he waived that claim at trial. Because we are not deciding whether the defendant waived this constitutional claim, we need not resolve the issue of whether a defendant can effectively waive a prosecutorial impropriety claim in light of *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004).

In *Stevenson*, our Supreme Court held that prosecutorial impropriety claims that are not objected to at trial are nonetheless reviewable. Id., 572–73. The court stated that it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because the determination of whether the

v. *Rowe*, supra, 279 Conn. 161; *State* v. *Smalls*, 78 Conn. App. 535, 540, 827 A.2d 784, cert. denied, 266 Conn. 931, 837 A.2d 806 (2003).

## III

The defendant's final claim is that the court improperly instructed the jury on the concept of reasonable doubt.[9] Specifically, he argues that the court unconstitutionally diluted the state's burden of proof by instructing the jury that "absolute certainty in the affairs of life is

defendant was deprived of a fair trial must involve the application of the factors set out in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). *State* v. *Stevenson*, supra, 573. Nevertheless, because a waiver carries consequences different from a mere failure to object; see *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007), *State* v. *Nichols*, 81 Conn. App. 478, 484–85, 840 A.2d 54 (2004); the answer to whether *Stevenson* also applies to a waived claim of prosecutorial impropriety is not obvious. It is not, however, essential for us to resolve this issue in the context of the present case.

[9] The court charged the jury on reasonable doubt as follows: "[T]he state must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged . . . . Now, the meaning of reasonable doubt can be arrived at by emphasizing the word 'reasonable.' It is not a surmise, a guess or mere conjecture. It is not a doubt suggested by counsel, which is not warranted by the evidence. . . . [It is] such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. It is not hesitation springing from any feelings of pity or sympathy for the accused or any other persons who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is the kind of doubt, which, in the serious affairs which concern you in everyday life, you would pay heed and attention to. It is a doubt that is honestly entertained and is reasonable in light of the evidence, after a fair comparison and careful examination of the entire evidence.

"Now, of course, absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty on the part of the jury before you return a verdict of guilty. Proof beyond a reasonable doubt does not mean proof beyond all doubt. The law requires that after hearing all the evidence, if there is something in the evidence or lack of evidence that leaves in the minds of the jurors as reasonable men and women a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion."

almost never attainable, and the law does not require absolute certainty on the part of the jury before you return a verdict of guilty." We do not agree.

Prior to the court's charge to the jury, the defendant objected generally to the reasonable doubt instruction and asserted that he was resting on his jury charge submission. The court overruled the defendant's objection, reasoning that the charge as given was a "correct statement of the law." We acknowledge that the state takes issue with the fact that the defendant did not draw the court's attention to the particular language he now challenges on appeal. Nevertheless, we conclude that because the defendant objected to the entire reasonable doubt instruction and stated that he was resting on his submission, which did not include this particular language, fair notice was given to the court of the defendant's view governing reasonable doubt and of any disagreement he may have had with its charge. See *State v. Ross*, 269 Conn. 213, 335–36, 849 A.2d 648 (2004) ("the essence of the preservation requirement is that fair notice be given to the trial court of the party's view of the governing law and of any disagreement that the party may have had with the charge actually given"). Therefore, we will review the defendant's claim.

"It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. . . . The [reasonable doubt concept] provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . At the same time, by impressing upon the [fact finder] the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. . . . [Consequently] [t]he defendants in a criminal case are entitled to a clear and unequivocal

charge by the court that [their] guilt . . . must be proved beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 334, 929 A.2d 278 (2007).

"[T]he perfect definition of reasonable doubt, however, is as uncertain as its place in American jurisprudence is certain. . . . Aside from imposing the general standard of reasonable doubt as a constitutional mandate, the United States Supreme Court has not provided a clear and simple definition, expressing instead a reluctance to impose a specific jury instruction. Indeed, the court has explained that the [c]onstitution does not require that any particular form of words be used in advising a jury of the government's burden of proof. *Victor* v. *Nebraska*, [511 U.S. 1, 5, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994)]. As a consequence, the major constraint on trial courts that formulate reasonable doubt instructions is that they avoid certain language that categorically has been rejected. . . . [T]he court generally has left the formation of an appropriate reasonable doubt instruction to the discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Jackson*, 283 Conn. 111, 117–18, 925 A.2d 1060 (2007). Connecticut courts "are not receptive to quibbling attacks on the reasonable doubt instruction . . . ." *State* v. *DelVecchio*, 191 Conn. 412, 421, 464 A.2d 813 (1983).

The standard of review for constitutional claims of improper jury instructions is well established. "[I]individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the

proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks omitted.) *State* v. *Jackson*, supra, 283 Conn. 117.

Again, in the present case, the defendant challenges the court's instruction that "absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty on the part of the jury before you return a verdict of guilty." Both this court and our Supreme Court, however, have previously upheld the employment of identical or nearly identical language. See *State* v. *Lemoine*, 256 Conn. 193, 202, 770 A.2d 491 (2001); *State* v. *Ryerson*, 201 Conn. 333, 342 n.2, 514 A.2d 337 (1986); *State* v. *Gooden*, 89 Conn. App. 307, 323, 873 A.2d 243, cert. denied, 275 Conn. 918, 919, 883 A.2d 1249 (2005); *State* v. *Howard*, 88 Conn. App. 404, 428 n.9, 870 A.2d 8, cert. denied, 275 Conn. 917, 883 A.2d 1250 (2005); *State* v. *Jones*, 82 Conn. App. 81, 87, 841 A.2d 1224, cert. denied, 269 Conn. 912, 852 A.2d 741 (2004); *State* v. *Dubose*, 75 Conn. App. 163, 167–69, 815 A.2d 213, cert. denied, 263 Conn. 909, 819 A.2d 841 (2003). In *Jones*, we held that "[t]his statement is not an improper component of an instruction on reasonable doubt because it accurately states the law . . . ." *State* v. *Jones*, supra, 87.

Accordingly, we conclude that the court's instruction did not reduce the state's burden of proving the defendant guilty beyond a reasonable doubt and, therefore, did not mislead the jury.

The judgment is affirmed.

In this opinion the other judges concurred.